UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:

BRAD THOMPSON,

      Plaintiff,

v.

CARNIVAL CORPORATION,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff hereby sues Defendant and alleges:

## PRELIMINARY ALLEGATIONS

1. Plaintiff, BRAD THOMPSON, is a citizen of the United States, and a citizen and a resident of the state of Nevada.

2. Defendant, CARNIVAL CORPORATION, (hereinafter "CARNIVAL"), is a corporation incorporated under the laws of Panama and maintains its principal place of business in Miami, Florida.

3. The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332. Specifically, the Parties to this action are completely diverse and the matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332. In the alternative, if diversity jurisdiction does not apply, then this matter falls under the Court's admiralty and maritime jurisdiction.

4. The causes of action asserted in this Complaint arise under the General Maritime Law of the United States.

1

5. Defendant, at all times material hereto, personally or through an agent:

    a. Operated, conducted, engaged in or carried on a business venture in this state and/or county or had an office or agency in this state and/or county;

    b. Was engaged in substantial business activity within this state;

    c. Operated vessels in the waters of this state;

    d. Committed one or more of the acts stated in Florida Statutes §§ 48.081, 48.181 or 48.193;

    e. The Defendant's acts/omissions set out in this Complaint occurred in whole or in part in this county and/or state; and/or

    f. Defendant, CARNIVAL, issued a cruise line ticket to Mr. Thompson requiring that any lawsuit against CARNIVAL relating to any injury he sustained in connection with the subject voyage be brought in this Court.

## **BACKGROUND**

6. At all times material hereto, CARNIVAL owned, operated, managed, maintained and/or controlled the subject vessel, the *Carnival Elation* (hereinafter the "vessel"), upon which Thompson was injured.

7. At all times material, CARNIVAL operated the vessel in navigable waters.

8. At all times material hereto, CARNIVAL created, owned, managed and/or operated the medical facility aboard the vessel.

9. At all times material hereto, CARNIVAL owned, operated, controlled, managed, and/or maintained the medical equipment in the medical facility aboard the vessel.

10. At all times material hereto, CARNIVAL maintained, controlled, ordered and/or supplied the medicine and/or medical equipment, including diagnostic equipment, for the medical facility aboard the vessel.

11. At all times material hereto, CARNIVAL staffed the medical facility aboard the vessel with a doctor(s) and/or a nurse(s). At all times material, the doctor(s) and nurse(s) aboard the vessel were full-time employees of CARNIVAL, subject to CARNIVAL's control, as CARNIVAL controlled the day-to-day activities of the shipboard doctor(s) and nurse(s) aboard the vessel (hereinafter collectively referred to as the "Medical Personnel").

12. At all times material hereto, CARNIVAL had control and/or the right to control any and all members of the Medical Personnel working in CARNIVAL's medical facility aboard the vessel, including the medical doctors, nurses and other medical personnel.

13. At all material times, CARNIVAL hired, retained, and/or had the right and ability to fire members of the Medical Personnel it carried aboard the vessel.

14. At all times material hereto, the members of CARNIVAL's Medical Personnel were in the regular, full-time employment of the vessel, as salaried members of the crew, subject to the vessel's discipline and the master's orders, and also under the control of CARNIVAL's shoreside medical department located in Miami, Florida, through modern means of communication such as "Face-to-Face Telemedicine."

15. At all times material hereto, the Medical Personnel were employees, actual agents, apparent agents, and/or joint venturers of CARNIVAL, and at all times material hereto, acted within the course and scope of their employment, agency, and/or joint venture relationship.

16. At all material times, CARNIVAL was responsible for, and liable for, the actions of the Medical Personnel with respect to treatment, or lack of treatment, of Mr. Thompson, based on theories of *respondeat superior*, apparent agency and/or joint venture.

17. At no time did CARNIVAL represent to Plaintiff or Mr. Thompson in particular, or to the vessel's passengers in general, in a meaningful way, that the Medical Personnel were not agents or employees of CARNIVAL, and/or that they were independent contractors.

**<u>Subject Incident</u>**

18. On May 1, 2023, Plaintiff was a fare-paying passenger and lawfully aboard the vessel, which vessel CARNIVAL operated in navigable waters.

19. Around dinner time, (between 4:30 p.m. and 5:30 p.m.) on May 1, 2023, Mr. Thompson began to experience symptoms including slurred speech, arm weakness, and tingling in his left arm and hand.

20. On May 1, 2023, Mr. Thompson contacted the ship's medical center to report his symptoms.

21. On May 1, 2023 a ship's nurse, "Jacob," attended Mr. Thompson in his cabin. After examining Mr. Thompson, the ship's nurse advised him to "sleep it off" and see if he felt better in the morning, since it would cost nearly $300 to see the ship's doctor. Mr. Thompson, trusting the ship's nurse's advice, remained in his bed and signed an "Guest Refusal to Consult with a Doctor" form required by the ship's nurse.

22. Despite his reported symptoms, CARNIVAL's shipboard doctor did not see, consult, or advise Mr. Thompson on May 1, 2023.

23. On the morning of May 2, 2023, Mr. Thompson was not feeling better, and was largely unable to walk.  Mr. Thompson went to the ship's medical center at or near 9:35 a.m. in a wheelchair. At that time, upon presentation to CARNIVAL's shipboard medical center, CARNIVAL's shipboard Medical Personnel noted that Mr. Thompson reported he was suffering from a stroke that began the evening before, and presented with left-sided facial droop, slurred speech, weakness in the left hand and dragging of the left foot. CARNIVAL's shipboard doctor thereafter diagnosed Mr.

Thompson with a stroke.

24. Rather than coordinate emergency evacuation or care for Mr. Thompson, the ship's doctor suggested a telemedicine consult with a neurologist, that would also be for a fee, as well as a brain scan for the following day (May 3, 2023) on shore.  Mr. Thompson declined a telemedicine consultation.

25. On the morning of May 2, 2023 Mr. Thompson was admitted to the ship's medical center where he began undergoing lab work. The ship's doctor diagnosed Mr. Thompson with cerebral infarction. He slowly began to be able to walk, and his slurred speech was noted to have improved. Despite the ship's doctor's diagnosis, the ship's doctor told Mr. Thompson at or near 12:24 p.m. to go back to his cabin and rest to see if his symptoms would continue to improve. CARNIVAL's medical records show the doctor noted that Mr. Thompson was discharged from the ship's medical center at 12:24 p.m. The ship's medical personnel also arranged for a shoreside referral by ambulance to be conducted the following day (May 3, 2023).

26. On May 2, 2023 at or near 4:15 p.m. Mr. Thompson's wife again contacted the ship's medical center to report that Mr. Thompson was panicking and his symptoms were worsening. The ship's nurse returned to Mr. Thompson's cabin and called for a wheelchair. At some point between 4:30 p.m. and 6:10 p.m., CARNIVAL's shipboard doctor first made contact with the vessel's Captain about Mr. Thompson's urgent emergency medical condition, and a helicopter evacuation was coordinated.

27. At 8:00 p.m., on May 2, 2023, more than 24 hours after his onset of stroke symptoms, the U.S. Coast Guard helicopter arrived and picked up Mr. Thompson from the vessel while the vessel was at sea.

28. CARNIVAL's shipboard doctor first made contact with the U.S. Coast Guard about Mr.

Thompson's condition hours after the shipboard doctor assessed Mr. Thompson's condition.

29. Such passage of time constitutes an unreasonable delay because well established and generally accepted tenets of medicine are that: i) a patient's stroke must be treated with the utmost urgency; ii) the sooner the patient receives shoreside diagnosis and treatment, the better prospects of recovery and/or survival; iii) with strokes, every minute matters to ensure the patient's recovery and/or survival; and iv) with strokes, medical decisions made in the first hour are the most important for the patient's recovery and/or survival.

30. Had CARNIVAL and the shipboard Medical Personnel advised the U.S. Coast Guard of Mr. Thompson's stroke condition sooner and/or not unreasonably delayed in doing so, the U.S. Coast Guard would have been able to arrange an earlier evacuation.  Mr. Thompson would have received emergency evacuation from the vessel earlier in the morning and arrived at a shoreside hospital for prompt and proper diagnosis and treatment sooner, and/or more likely than not, Mr. Thompson would have not been permanently disabled as a result of the stroke.

31. The negligent conduct on the part of CARNIVAL, its employees, agents, the shipboard Medical Personnel and CARNIVAL's shoreside Medical Department include, but are not limited to:

a. CARNIVAL's shipboard Medical Personnel failed to timely assess Mr. Thompson's medical condition.

b. CARNIVAL's shipboard Medical Personnel failed to timely arrange Mr. Thompson's emergency evacuation from the vessel, including, but not limited to an unreasonable delay in alerting the U.S. Coast Guard as to Mr. Thompson's medical condition.

c. CARNIVAL's shipboard Medical Personnel failed to timely inform the vessel's Captain as to Mr. Thompson's emergency medication condition.

d. CARNIVAL's shipboard Medical Personnel failed to provide Mr. Thompson with prompt and/or proper shipboard medical care, including but not limited to the provision of appropriate medications available shipboard to treat his stroke condition and/or slow its progression.

e. CARNIVAL, its shipboard Captain, shipboard Medical Personnel, and shoreside Medical Department failed to adequately staff the vessel with sufficient medical personnel and/or sufficient medical supplies and/or medication.

f. CARNIVAL, its shipboard Captain, shipboard Medical Personnel, and shoreside Medical Department, failed to timely arrange an emergency medical response to Mr. Thompson's emergency medical condition.

32. As a direct result of the foregoing facts, Mr. Thompson did not receive prompt nor proper medical care for his stroke condition, he suffered additional physical pain and mental anguish, and he ultimately was left with permanent, life-changing impairments as a result of CARNIVAL's negligence.

<strong>COUNT I – GENERAL NEGLIGENCE AGAINST CARNIVAL</strong>

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty-two (32) above, as though alleged originally herein, and further alleges:

33. At all times material, CARNIVAL owed Mr. Thompson a duty to provide reasonable care under the circumstances.

34. On or about May 1, 2023 and May 2, 2023, CARNIVAL breached its duty to provide Mr. Thompson reasonable care under the circumstances as follows:

a. Failing to timely assess Mr. Thompson's medical condition;

b. Failing to timely arrange Mr. Thompson's emergency evacuation from the vessel, including, but not limited to an unreasonable delay in alerting the U.S. Coast Guard as to Mr. Thompson's medical condition;

c. Failing to timely inform the vessel's Captain as to Mr. Thompson's emergency medical condition;

d. Failing to provide Mr. Thompson with prompt and/or proper shipboard medical care, including but not limited to the provision of appropriate medications available shipboard to treat his stroke condition and/or slow its progression;

e.  Failing to adequately staff the vessel with sufficient medical personnel, sufficient medical supplies and/or medication;

f.  Failing to timely arrange an emergency medical response to Mr. Thompson's emergency medical condition;

g.  Failing to have tools in place and/or failure to use those tools when necessary, such as in Mr. Rodhouse's case here and/or otherwise failing to have adequate procedures, policies or tools in place to ensure adequate communication between the Medical Personnel and CARNIVAL's shoreside medical department;

h.  Failure to furnish Mr. Thompson such medical advice, aid and/or assistance as an ordinarily prudent person would render under similar circumstances in view of CARNIVAL's undertaking to equip the vessel with a medical facility and medical personnel;

i.  Failing to promptly and/or adequately diagnose Mr. Thompson's medical emergency condition;

j.  Failing to adequately treat Mr. Thompson's medical condition as a medical emergency;

k.  Failing to utilize telephone and/or video consultations with specialists, shipboard or shoreside, during the medical care and treatment of Mr. Thompson and/or otherwise failing to promptly have Mr. Thompson seen by a shoreside physician and/or specialist.

35. At all times material hereto, CARNIVAL knew of the foregoing conditions, or the conditions existed for a sufficient length of time so that CARNIVAL, in the exercise of reasonable care under the circumstances, should have learned of them.  This knowledge was or should have been acquired through prior incidents involving CARNIVAL's ship's doctors and/or nurses whom provided improper medical advice and/or treatment to passengers aboard CARNIVAL's vessels. *See, e.g., Murphy v. Carnival Corp.*, Case No. 19-cv-21450-RNS (S.D. Fla. 2019); *Gharfeh v. Carnival Corp.*, 309 F. Supp. 3d 1317, 1327 (S.D. Fla. 2018); *Rinker v. Carnival Corp.*, Case No. 09-23154-CIV (S.D. Fla. 2010).

36. CARNIVAL's negligent acts and omissions caused Mr. Thompson's permanent impairments suffered as a result of his stroke.

37. As a direct and proximate result of CARNIVAL's above-described negligence, Mr. Thompson was injured about his body and extremities, suffered physical pain, mental anguish, fright, shock, loss of enjoyment of life, permanent disability, impairment, handicap, death and incurred medical expenses in the care and treatment of his injuries. Mr. Rodhouse also lost wages, earning capacity and the benefit of the vacation, cruise, and transportation cost.

**WHEREFORE,** Plaintiff demands judgment against Defendant, CARNIVAL for all damages recoverable by law, and demands a jury trial of all issues so triable.

## COUNT II – NEGLIGENT FAILURE TO WARN AGAINST CARNIVAL

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty-two (32) above, as though alleged originally herein, and further alleges:

38. At all times material, CARNIVAL owed Mr. Thompson a duty to exercise reasonable care under the circumstances.

39. Further, and as part of the above-mentioned duty, at all times material CARNIVAL owed Mr. Thompson a duty to warn of dangers that were known, or reasonably should have been known, to CARNIVAL in places where passengers like Mr. Thompson were invited or were reasonably be expected to visit, including, but not limited to, in the ship's medical facility and/or as it pertains to the medical services CARNIVAL offered and/or provided to passengers like Mr. Thompson aboard same.

40. On or about May 1, 2023 and May 2, 2023, CARNIVAL breached its duty to provide Mr. Thompson with reasonable care under the circumstances, including the duty to warn, and Mr. Thompson was thereby injured due to the fault and negligence of CARNIVAL as follows:

a. Failure to reasonable warn passengers, including Mr. Thompson, that CARNIVAL was unable to timely arrange passengers' emergency evacuation from the vessel and/or CARNIVAL would delay doing so;

b.  Failure to reasonably warn passengers, including Mr. Thompson, that CARNIVAL was unable to provide passengers prompt and/or proper shipboard medical care;

c.  Failure to warn passengers, including Mr. Thompson, that CARNIVAL did not employ an adequate number of Medical Personnel aboard the vessel to handle medical emergencies, in light of CARNIVAL's undertaking of a duty to man the vessel with a medical facility and Medical Personnel; and/or

d.  Failure to warn passengers, including Mr. Thompson, that CARNIVAL did not have adequate procedures, policies or tools in place to ensure adequate communication between the Medical Personnel shipboard and CARNIVAL's shoreside medical department, in order to ensure a proper and/or more reliable diagnosis of emergency medical conditions.

41. At all times material hereto, CARNIVAL knew of the foregoing conditions, or the conditions existed for a sufficient length of time so that CARNIVAL, in the exercise of reasonable care under the circumstances, should have learned of them. This knowledge was or should have been acquired through prior incidents involving CARNIVAL's ship's doctors and/or nurses whom provided improper medical advice and/or treatment to passengers aboard CARNIVAL's vessels. *See, e.g., Murphy v. Carnival Corp.*, Case No. 19-cv-21450-RNS (S.D. Fla. 2019); *Gharfeh v. Carnival Corp.*, 309 F. Supp. 3d 1317, 1327 (S.D. Fla. 2018); *Rinker v. Carnival Corp.*, Case No. 09-23154-CIV (S.D. Fla. 2010).

42. CARNIVAL's negligent acts and omissions as outlined above caused Mr. Thompson to suffer permanent impairments as a result of the stroke.

43. As a direct and proximate result of CARNIVAL's above-described negligence, Mr. Thompson was injured about his body and extremities, suffered physical pain, mental anguish, fright, shock, loss of enjoyment of life, permanent disability, impairment, handicap, death and incurred medical expenses in the care and treatment of his injuries. Mr. Thompson also lost wages, earning capacity and the benefit of the vacation, cruise, and transportation cost.

**WHEREFORE,** Plaintiff demands judgment against Defendant, CARNIVAL for all damages recoverable by law, and demands a jury trial of all issues so triable.

### COUNT III – NEGLIGENCE AGAINST CARNIVAL FOR THE NEGLGIENT CONDUCT OF THE MEDICAL PERSONNEL BASED ON A THEORY OF VICARIOUS LIABILITY UNDER *RESPONDEAT SUPERIOR*

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty-two (32) above, as though alleged originally herein, and further alleges:

44. At all times material hereto, the Medical Personnel were the ship's doctors and nurses aboard the vessel.

45. At all times material hereto, the Medical Personnel were agents, servants and/or employees of CARNIVAL.

46. At all times material hereto, the Medical Personnel were acting within the scope of their employment and/or agency with CARNIVAL.

47. At all times material hereto, CARNIVAL acknowledged that the Medical Personnel would act on CARNIVAL's behalf, and the Medical Personnel accepted the undertaking, based on the following:

a. The Medical Personnel worked in the medical facility, which was created, owned and/or operated by CARNIVAL.

b. CARNIVAL's logo and insignias were displayed in various places throughout the medical facility.

c. CARNIVAL's website publicly described the medical facility in proprietary language, including, but not limited to, "our medical centers…"

d. CARNIVAL billed and collected payments directly from passengers for the medical services provided by the Medical Personnel, and CARNIVAL did so through passengers' onboard accounts with CARNIVAL.

e. The Medical Personnel were employed full-time by CARNIVAL.

f. The Medical Personnel were paid a salary by CARNIVAL.

g. The Medical Personnel wore uniforms and/or nametags, which were provided by CARNIVAL and had CARNIVAL's name and logo.

h. The Medical Personnel referred to themselves as crewmembers, and CARNIVAL referred to the Ship's Doctors and Ship's Nurses as ship's officers.

i. The Medical Personnel were under the commands of the ship's officers and followed all of the master's rules and regulations.

j. The Medical Personnel spoke to Plaintiff as though they had authority by CARNIVAL to render medical treatment to Plaintiff and on CARNIVAL's behalf.

48. At all times material hereto, the Medical Personnel were subject to the control and/or right to control by CARNIVAL, based on the allegations set forth in the preceding paragraph, along with the following:

a. The Medical Personnel were employed full-time by CARNIVAL, paid a salary by CARNIVAL, and worked in the medical facility aboard the vessel which at all times material was created, owned maintained and/or operated by CARNIVAL.

b. CARNIVAL stocked and equipped the medical facility, and as such, the equipment (including diagnostic) and medications necessary for the Medical Personnel to perform their work was furnished by CARNIVAL.

c. The Medical Personnel were subject to CARNIVAL's training requirements and were under the commands of CARNIVAL's ship's officers and the master's rules and regulations.

d. CARNIVAL maintained control over the day-to-day operations and/or duties of the Medical Personnel.

e. CARNIVAL had the right to fire the Medical Personnel.

49. At all times material hereto, CARNIVAL had a duty to provide Mr. Thompson with reasonable care under the circumstances.

50. At all times material hereto, the Medical Personnel owed a duty to provide Mr. Thompson with reasonable care under the circumstances.

51. At all times material hereto, CARNIVAL, through the acts/omissions of the Medical Personnel, breached their duty to provide reasonable care under the circumstances to Mr. Thompson through the following acts and/or omissions:

a. Failing to timely assess Mr. Thompson's medical condition;

b. Failing to timely arrange Mr. Thompson's emergency evacuation from the vessel, including, but not limited to unreasonably delay in alerting the U.S. Coast Guard as to Mr. Thompson's medical condition;

c. Failing to timely inform the vessel's Captain as to Mr. Thompson's emergency medication condition;

d. Failing to provide Mr. Thompson with prompt and/or proper shipboard medical care, including but not limited to the provision of appropriate medications available shipboard to treat his stroke condition and/or slow its progression;

e. Failing to timely arrange an emergency medical response to Mr. Thompson's emergency medical condition;

f. Failing to have medical tools in place and/or failure to use those tools when necessary, such as in Mr. Thompson's case here and/or otherwise failing to have adequate procedures, policies or tools in place to ensure adequate communication between the Medical Personnel and CARNIVAL's shoreside medical department;

g. Failure to furnish Mr. Thompson such medical advice, aid and/or assistance as an ordinarily prudent person would render under similar circumstances in view of CARNIVAL's undertaking to equip the vessel with a medical facility and medical personnel;

h. Failing to utilize telephone and/or video consultations with specialists, shipboard or shoreside, during the medical care and treatment of Mr. Thompson and/or otherwise failing to promptly have Mr. Thompson seen by a shoreside physician and/or specialist;

i. Breaching the prevailing professional standard of care for health care providers (i.e., the level of care, skill and treatment that, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by a reasonably prudent similar health care provider).

52. CARNIVAL's negligent acts and omissions, and/or its agents, apparent agents, servants, and/or employees negligent acts and omissions, as outlined above, caused Thompson permanent,

irreversible brain damage.

53. As a direct and proximate result of CARNIVAL's above-described negligence, Mr. Thompson was injured about his body and extremities, suffered physical pain, mental anguish, fright, shock, loss of enjoyment of life, permanent disability, impairment, handicap, and incurred medical expenses in the care and treatment of his injuries. Mr. Thompson also lost wages, earning capacity and the benefit of the vacation, cruise, and transportation cost.

**WHEREFORE,** Plaintiff demands judgment against Defendant, CARNIVAL for all damages recoverable by law, and demands a jury trial of all issues so triable.

**COUNT IV – NEGLIGENCE AGAINST CARNIVAL FOR THE ACTS OF THE MEDICAL PERSONNEL BASED ON A THEORY OF VICARIOUS LIABILITY UNDER APPARENT AGENCY**

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty-two (32) above, as though alleged originally herein, and further alleges:

54. At all times material hereto, the Medical Personnel were the ship's doctors and nurses aboard the vessel.

55. At all times material hereto, CARNIVAL and the Medical Personnel represented to passengers aboard the vessel, including Mr. Thompson, that the Medical Personnel were CARNIVAL's agents and/or employees, as follows:

a. The Medical Personnel worked in the medical facility, which was created, owned and/or operated by CARNIVAL.

b. CARNIVAL's logo and insignias were displayed in various places throughout the medical facility.

c. CARNIVAL's website publicly described the medical facility in proprietary language, including, but not limited to, "our medical centers…"

d.  CARNIVAL billed and collected payments directly from passengers for the medical services provided by the Medical Personnel, and CARNIVAL did so through passengers' onboard accounts with CARNIVAL.

e.  The Medical Personnel were employed full-time by CARNIVAL.

f.  The Medical Personnel were paid a salary by CARNIVAL.

g.  The Medical Personnel wore uniforms and/or nametags, which were provided by CARNIVAL and had CARNIVAL's name and logo.

h.  The Medical Personnel referred to themselves as crewmembers, and CARNIVAL referred to the Ship's Doctors and Ship's Nurses as ship's officers.

i.  The Medical Personnel were under the commands of the ship's officers and followed all of the master's rules and regulations.

j.  The Medical Personnel spoke to Mr. Thompson as though they had authority by CARNIVAL to render medical treatment to him and on CARNIVAL's behalf.

56. At all times material hereto, Mr. Thompson reasonably relied on the above, to his detriment, so as to believe that the Medical Personnel were the agents and/or employees of CARNIVAL in choosing to cruise aboard the vessel, seek medical attention at the vessel's medical facility, and receive medical treatment from the Medical Personnel aboard same.

57. At all times material hereto, it was reasonable for Mr. Thompson to believe that the Medical Personnel were authorized to render medical services for CARNIVAL's benefit because CARNIVAL billed passengers directly for the onboard medical services, CARNIVAL's logo and insignias were displayed in various places throughout the medical facility, and/or CARNIVAL's name and logo were on the Medical Personnel's uniforms and/or nametags. It was also reasonable because CARNIVAL marketed the shipboard medical facility and/or the Medical Personnel in a manner so as to induce passengers, like Mr. Thompson, to buy cruises aboard CARNIVAL's vessels and utilize its medical facility.

58. For instance, CARNIVAL marketed its cruise ships as having "medical centers [that] meet or exceed the standards established by the Cruise Lines International Association (CLIA) and the American College of Emergency Physicians (ACEP)." Further, the Medical Personnel, specifically, spoke to Mr. Thompson and provided Mr. Thompson medical assessment, treatment and/or advice as though he had authority by CARNIVAL to render medical treatment on CARNIVAL's behalf.

59. At all times material hereto, Plaintiff and Mr. Thompson's reasonable reliance was detrimental because, had he known that the Medical Personnel were not CARNIVAL's agents and/or employees, he would not have selected the cruise, sought treatment from the Medical Personnel, relied upon the treatment rendered by CARNIVAL/the Medical Personnel and/or forgone seeking emergency medical treatment shoreside through alternative means outside of CARNIVAL while he remained aboard the vessel during the subject incident.

60. At all times material hereto, CARNIVAL had a duty to provide Mr. Thompson with reasonable care under the circumstances, including through the conduct of its apparent agents.

61. At all times material hereto, CARNIVAL breached its duty to provide reasonable care under the circumstances through the following acts and/or omissions of its apparent agents, the Medical Personnel:

a. Failing to timely assess Mr. Thompson's medical condition;

b. Failing to timely arrange Mr. Thompson's emergency evacuation from the vessel, including, but not limited to unreasonably delay in alerting the U.S. Coast Guard as to Mr. Thompson's medical condition;

c. Failing to timely inform the vessel's Captain as to Mr. Thompson's emergency medication condition;

d. Failing to provide Mr. Thompson with prompt and/or proper shipboard medical care, including

but not limited to the provision of appropriate medications available shipboard to treat his stroke condition and/or slow its progression;

e. Failing to timely arrange an emergency medical response to Mr. Thompson's emergency medical condition;

f. Failing to have medicinal tools in place and/or failure to use those tools when necessary, such as in Mr. Thompson's case here and/or otherwise failing to have adequate procedures, policies or tools in place to ensure adequate communication between the Medical Personnel and CARNIVAL's shoreside medical department;

g. Failure to furnish Mr. Thompson such medical advice, aid and/or assistance as an ordinarily prudent person would render under similar circumstances in view of CARNIVAL's undertaking to equip the vessel with a medical facility and medical personnel;

h. Failing to utilize telephone and/or video consultations with specialists, shipboard or shoreside, during the medical care and treatment of Mr. Thompson and/or otherwise failing to promptly have Mr. Thompson seen by a shoreside physician and/or specialist;

i. Breaching the prevailing professional standard of care for health care providers (i.e., the level of care, skill and treatment that, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by a reasonably prudent similar health care provider).

62. CARNIVAL's negligent acts and omissions (and/or its agents, apparent agents, servants, and/or employees negligent acts and omissions), as outlined above, caused Mr. Thompson permanent, irreversible brain damage.

63. As a direct and proximate result of CARNIVAL's above-described negligence, Mr. Thompson was injured about his body and extremities, suffered physical pain, mental anguish, fright, shock, loss of enjoyment of life, permanent disability, impairment, handicap, death and incurred medical expenses in the care and treatment of his injuries. Mr. Thompson also lost wages, earning capacity and the benefit of the vacation, cruise, and transportation cost.

**WHEREFORE,** Plaintiff demands judgment against Defendant, CARNIVAL for all damages recoverable by law, and demands a jury trial of all issues so triable.

18

## COUNT V – NEGLIGENCE AGAINST CARNIVAL FOR
## THE CONDUCT OF MEDICAL PERSONNEL BASED ON A THEORY
## OF VICARIOUS LIABILITY UNDER JOINT VENTURE

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty-two (32) above, as though alleged originally herein, and further alleges:

64. At all times material hereto, the Ship's Doctors and Ship's Nurses served as Medical Personnel aboard the vessel.

65. At all times material hereto, CARNIVAL and the Medical Personnel had the intention to engage in a joint venture to provide medical services to CARNIVAL's passengers.  The intention was established by verbal agreement and/or conduct. The common purpose of the venture was to profit from providing medical services to CARNIVAL's passengers.

66. At all times material hereto, CARNIVAL and the Medical Personnel had joint control or right of control over the medical care and services provided to passengers, as follows:

a. As its part of the joint venture, CARNIVAL controlled and oversaw certain aspects of the day-to-day operations of the medical facility and medical personnel aboard the vessel. For instance, CARNIVAL's shoreside medical department monitored and supervised the Ship's Doctors and Ship's Nurses through its shoreside orientation trainings, standard operating procedures, and/or other standards, policies, procedures and guidelines the Ship's Doctors and Ship's Nurses were required to follow.  CARNIVAL ordered and restocked the medical supplies and medicine, and it ordered and maintained the medical equipment.  CARNIVAL had control over the billings and collections for the vessel's medical facility.  CARNIVAL provided approval and/or authorization on proposed medical evacuations.  CARNIVAL provided medical consultations to passengers from shoreside doctors.  CARNIVAL controlled and/or had the right to control the marketing of its medical facility and/or the Ship's Doctors/Ship's Nurses.

b. As their part of the joint venture, the Ship's Doctors and Ship's Nurses controlled and oversaw certain aspects of the day-to-day operations of the medical facility and medical personnel aboard the vessel.  For instance, the Ship's Doctors and Ship's Nurses provided the labor through their consultations, treatment and care to passengers aboard the vessel so as to generate charges to passengers. The Ship's Doctors/Ship's Nurses initiated and/or requested medical evacuations for passengers.  The Ship's Doctors completed and/or oversaw the medical personnel's completion of medical records.

67. At all times material hereto, CARNIVAL and the Medical Personnel shared a joint proprietary or ownership interest in the vessel's medical facility.  CARNIVAL had an interest in recommending, marketing, and operating the vessel's medical facility as well as billing and collecting payment for the medical services provided to passengers aboard the vessel.  The Medical Personnel had a proprietary interest in the time and labor expended in operating the vessel's medical facility.

68. At all times material hereto, CARNIVAL and the Medical Personnel had the duty to share the profits and the losses of the joint venture based on the circumstances of their agreement. CARNIVAL and the Medical Personnel relied on a single billing system and a unified strategy of CARNIVAL's marketing and advertisements.  CARNIVAL and the Medical Personnel shared profits and losses, and they split revenue from medical services and supplies rendered to CARNIVAL's thousands of cruise passengers. The Ship's Doctors had the sole discretion to render medical care, treatment and services to passengers and to sell prescription medication and medical supplies to passengers; and the Ship's Doctors and Ship's Nurses increased profits by rendering medical care, treatment and services to passengers and by prescribing passengers medications and supplies.  CARNIVAL's compensation for the Medical Personnel was dependent, at least in part, on the medical facility's revenues; and the medical facility's revenues depended, at least in part, on the recommendations and prescriptions the Ship's Doctors provided to passengers.  Further, in Florida, a duty to share losses actually and impliedly exists as a matter of law where one party supplies the labor, experience and skill (like the Ship's Doctors and Ship's Nurses), and the other the necessary capital (like CARNIVAL).

69. At all times material hereto, CARNIVAL had a duty to provide Mr. Thompson with reasonable care under the circumstances, including through the acts of its joint venturers.

70. At all times material hereto, CARNIVAL breached its duty to provide reasonable care under the circumstances through the following acts and/or omissions of its joint venturers, the Medical Personnel and/or Shoreside Medical Department:

a.  Failing to timely assess Mr. Thompson's medical condition;

b.  Failing to timely arrange Mr. Thompson's emergency evacuation from the vessel, including, but not limited to unreasonably delay in alerting the U.S. Coast Guard as to Mr. Thompson's medical condition;

c.  Failing to timely inform the vessel's Captain as to Mr. Thompson's emergency medical condition;

d.  Failing to provide Mr. Thompson with prompt and/or proper shipboard medical care, including but not limited to the provision of appropriate medications available shipboard to treat his stroke condition and/or slow its progression;

e.  Failing to timely arrange an emergency medical response to Mr. Thompson's emergency medical condition;

f.  Failing to have medical tools in place and/or failure to use those tools when necessary, such as in Mr. Thompson's case here and/or otherwise failing to have adequate procedures, policies or tools in place to ensure adequate communication between the Medical Personnel and CARNIVAL's shoreside medical department;

g.  Failure to furnish Mr. Thompson such medical advice, aid and/or assistance as an ordinarily prudent person would render under similar circumstances in view of CARNIVAL's undertaking to equip the vessel with a medical facility and medical personnel;

h.  Failing to utilize telephone and/or video consultations with specialists, shipboard or shoreside, during the medical care and treatment of Mr. Thompson and/or otherwise failing to promptly have Mr. Thompson seen by a shoreside physician and/or specialist;

i.  Breaching the prevailing professional standard of care for health care providers (i.e., the level of care, skill and treatment that, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by a reasonably prudent similar health care provider).

71. CARNIVAL's negligent acts and omissions, and/or its agents, apparent agents, servants, and/or employees negligent acts and omissions, as outlined above, caused Plaintiff's permanent brain damage and physical impairment.

72. As a direct and proximate result of CARNIVAL's above-described negligence, Mr. Thompson was injured about his body and extremities, suffered physical pain, mental anguish, fright, shock, loss of enjoyment of life, permanent disability, impairment, handicap, death and incurred medical expenses in the care and treatment of his injuries. Mr. Thompson also lost wages, earning capacity and the benefit of the vacation, cruise, and transportation cost.

**WHEREFORE,** Plaintiff demands judgment against Defendant, CARNIVAL for all damages recoverable by law, and demands a jury trial of all issues so triable.

## COUNT VI – NEGLIGENT MEDICAL STAFFING, PROVISIONING AND/OR EQUIPPING OF MEDICAL FACILITY AGAINST CARNIVAL

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty-two (32) above, as though alleged originally herein, and further alleges:

73. At all times material hereto, it was the duty of CARNIVAL to exercise reasonable care to properly man the vessel's medical facilities, to provide the appropriate resources to the medical staff, and to provide reasonable and appropriate equipment, supplies, and medications for the vessel's medical facility. These duties arise through CARNIVAL (a) voluntarily undertaking to provide medical facilities, doctors, nurses and/or other medical staff for passengers aboard its cruise ships; (b) marketing its cruise ships as providing "medical centers [that] meet or exceed the standards established by the Cruise Lines International Association (CLIA) and the American College of Emergency Physicians (ACEP)"; and (c) marketing its cruise ships as having "from one physician and three nurses to as many as two physicians and five nurses."

74. On or about the above date(s), (May 1, 2023 and May 2, 2023), CARNIVAL and/or its agents, servants, joint venturers and/or employees breached its duty to exercise reasonable care, based on the following acts and/or omissions:

a.  Failing to have an adequate number of medical employees to handle medical emergencies, as it is unrealistic to have a medical team consisting of one or two doctors and/or two or three nurses to perform all the services required on a ship carrying thousands of passengers and crew;

b.  Failing to have at least one Ship's Doctor on duty at all times on a rotational basis in order to evaluate passenger's medical emergencies, like that of Mr. Thompson's case here;

c.  Failing to supply and/or maintain the vessel's medical facility with operational medical equipment to promptly and/or adequately assess and/or diagnose Mr. Thompson's medical condition;

d.  Failing to supply sufficient and/or adequate medication to promptly and/or adequately treat Mr. Thompson's medical condition; and/or

e.  Failing to supply the vessel's medical facility with resources, such as manuals and treatises, and/or access for contacting medical professionals in the United States for consultation about the care and treatment of significant and/or emergency medical conditions of its passengers, like that of Mr. Thompson's here.

At all times material hereto, CARNIVAL knew of the foregoing conditions rendering the medical facility inadequate, or the conditions existed for a sufficient length of time so that CARNIVAL, in the exercise of reasonable care under the circumstances, should have learned of them.  This knowledge was or should have been acquired through (a) inventories and/or inspections of the vessel's medical facility conducted by CARNIVAL, and/or (b) prior incidents involving ship's doctors and/or nurses providing improper medical treatment to passengers aboard CARNIVAL's vessels due, at least in part, to the inadequate medical facilities. *See, e.g., Murphy v. Carnival Corp.*, Case No. 19-cv-21450-RNS (S.D. Fla. 2019); *Gharfeh v. Carnival Corp.*, 309 F. Supp. 3d 1317, 1327 (S.D. Fla. 2018); *Rinker v. Carnival Corp.*, Case No. 09-23154-CIV (S.D. Fla. 2010). These inventories, inspections and/or prior incidents did or should have revealed the conditions set forth in the preceding paragraph.

75. CARNIVAL's negligent acts and omissions (and/or its agents, apparent agents, servants, and/or employees negligent acts and omissions), as outlined above, caused Mr. Thompson's permanent injury, impairment, and disabilities.

76. As a direct and proximate result of CARNIVAL's above-described negligence, Mr. Thompson was injured about his body and extremities, suffered physical pain, mental anguish, fright, shock, loss of enjoyment of life, permanent disability, impairment, handicap, death and incurred medical expenses in the care and treatment of his injuries. Mr. Rodhouse also lost wages, earning capacity and the benefit of the vacation, cruise, and transportation cost.

**WHEREFORE,** Plaintiff demands judgment against Defendant, CARNIVAL for all damages recoverable by law, and demands a jury trial of all issues so triable.

Dated: April 22, 2024

Respectfully submitted,

LIPCON, MARGULIES
& WINKLEMAN, P.A.
*Attorneys for Plaintiff*
2800 Ponce de Leon Blvd.
Suite 1480
Coral Gables, FL 33134
Telephone No.: (305) 373-3016
Facsimile No.: (305) 373-6204

By:   */s/ Karen F. Grossman*
      **KAREN F. GROSSMAN**
      Fla. Bar. No. 767883
      kgrossman@lipcon.com